**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID R. LEASE,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 1:05-CV-618** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **KEVIN TYLER, <u>et al.</u>,** | : | |
| | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Before the Court are motions for summary judgment filed by Defendants Kevin Tyler (Doc. No. 65), Douglas Fishel (Doc. No. 60), Ronald Plank, and Adams Electric Cooperative (Doc. No. 61). The motions have been briefed (Doc. Nos. 62, 66-67, 73, 75-76) and are ripe for disposition. In their motions, Defendants assert that Plaintiff David Lease has presented insufficient evidence of a deprivation of constitutional rights. For the reasons that follow, the Court agrees and will grant the motions for summary judgment.

**I.       BACKGROUND**

Plaintiff David Lease initiated this civil action by filing a complaint in this Court on March 28, 2005. (Doc. No. 1.) On May 5, 2005, Plaintiff filed his first amended complaint, in which he alleged that Defendants conducted an unlawful search of his property in March 2004 in violation of his Fourth and First Amendment rights. (Doc. No. 6.) Specifically, Lease contends that on March 17, 2004, Defendants improperly entered onto his property, "removed the face of and otherwise damaged meters belonging to the plaintiff which were on his property," and otherwise engaged in a "fishing expedition . . . [to] carr[y] out the retaliatory interests of Hamilton Township." (<u>Id.</u> ¶ 14-15.) Hamilton Township's alleged desire to retaliate against Lease stems from a long-standing dispute between the two that includes, inter alia, lawsuits filed

in 1996, 1999, and 2000.  (Id. ¶ 16); (Doc. No. 63, ¶¶ 110-12) (hereinafter "statement of material

facts" or "SMF"); (Doc. No. 72, ¶¶ 110-12) (hereinafter "counter-statement of material facts" or

"CSMF").

***The apartment building and its meters***[1]

Plaintiff David Lease is a gentleman in his sixties who owns certain property in New

Oxford, Adams County, Pennsylvania, including the six-unit apartment building located at 160

---

[1]  In accordance with the standard of review for a motion for summary judgment, the
Court will present the facts in the light most favorable to Lease, as the non-moving party.
Constructing the facts was rendered more difficult by the manner in which Lease crafted his
responsive statement of facts.  There are numerous instances in which Lease failed to provide
appropriate citations to the record to support his denials of Defendants' properly supported
factual statements.  Additionally, many of Lease's denials challenge relevancy as opposed to
factual accuracy.  Plaintiff's counsel has previously been advised that "this is an improper use of
the statement of facts, which is not intended to serve as a legal brief."  Barshinger v. Buffington,
No. 1:03-CV-0506, 2004 U.S. Dist. LEXIS 28929, at *2 n.1 (M.D. Pa. June 10, 2004).  The
Court notes that it has engaged in an independent review of the record, and has not relied upon
alleged facts to which Lease made properly supported objections, see M.D. Pa. L.R. 56.1.

Also complicating the statement of facts is Lease's reliance upon an affidavit that
contradicts, in certain respects, his earlier deposition testimony and offers no explanation for the
apparent inconsistencies.  (Doc. No. 74-5) (Lease Affidavit); (see, e.g., Doc. No. 76) (detailing
some of the statements in the affidavit and demonstrating how they contradict Lease's earlier
sworn testimony).  The Court will not credit Lease's affidavit insofar as it contradicts his
deposition testimony.  See In re CitX Corp., Inc., 448 F.3d 672, 679 (3d Cir. 2006) (noting that a
"sham affidavit" is one that attempts to "explain away or patch up an earlier deposition in an
attempt to create a genuine issue of material fact," and explaining that the "sham affidavit
doctrine" generally "refers to the trial courts' practice of disregarding an offsetting affidavit that
is submitted in opposition to a motion for summary judgment when the affidavit contradicts the
affiant's prior deposition testimony") (citation omitted); see also Jiminez v. All American
Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007) ("[I]f it is clear that an affidavit is offered
solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude
that no reasonable jury could accord that affidavit evidentiary weight and that summary
judgment is appropriate.").

Gun Club Road that is the site of the alleged constitutional violations in this case.  (SMF ¶¶ 1, 9, 11.)

The apartments at 160 Gun Club Road receive electricity from Defendant Adams Electric Cooperative, of which Lease is a member.  (SMF ¶ 16.)  As a member, Lease is "bound by the Cooperative's articles of Incorporation, Bylaws, policies, rules and regulations," and as a condition of his membership in the cooperative, Lease agreed that Adams Electric would have an "easement for the inspection, construction, operation, repair, maintenance, relocation and removal of electric distribution lines, meters, or other facilities to serve the Applicant's premises."  (SMF ¶¶ 17-19.)

In the mid-1990's, Adams Electric installed a single meter on a pole on Gun Club Road to monitor the total use of electricity for the apartment building.  (SMF ¶ 21.)  Previously, the electricity consumption for the apartments had been measured by several individual meters in a meter base adjacent to the apartment building.  (Id.)  After Adams Electric installed the street-side meter, meters had remained in the meter base adjacent to the building, allowing Lease to track the electricity usage per apartment, until sometime around 2001, when Adams Electric removed those meters, "plugged all of the meters with bars," and sealed the openings where the meters had been with "pie plate" covers.[2]  (Doc. No. 74-5, Lease Aff. ¶ 4.)  Even in the absence of the meters, electrical current continued to flow through the meter base to the apartments.  (Id.)

---

[2] "Pie plate covers" are protective covers over the open spaces where meters are normally placed that prevent members of the "public from reaching into the meter base and getting . . . electrocuted or harmed in any way."  (SMF ¶ 80.)  The pie plate covers are held in place by a metal ring that is closed with a hard plastic seal.  (SMF ¶ 81.)  Typically, a tool is required to remove the seal and ring.  (SMF ¶ 82.)

***Events leading up to the March 17, 2004, visit to Lease's property***

Beginning in the summer of 2003, Defendant Kevin Tyler served as a Zoning and Code Enforcement Officer for Hamilton Township.  (SMF ¶ 2; Doc. No. 64-2, Tyler Dep. 8).  In this capacity, he received numerous complaints—Tyler estimated the number to be over a hundred—from township residents about Lease's property.  (SMF ¶ 28.)  Many of the complaints concerned sewage and runoff from the property and excessive smoke believed to be coming from an incinerator operated on the property.  (SMF ¶ 29.)  Because of the significant number of complaints and his uncertainty how to handle the situation as a relatively new code enforcement officer, Tyler sought guidance from the Adams County District Attorney's Office.  (SMF ¶¶ 32-35.)  On his own initiative, Tyler discussed the situation with Assistant District Attorney Brian Coffey and expressed concern about how he was to "specifically write" the proper citations.  (SMF ¶¶ 36-38.)

Following a public meeting during which residents complained about the property (SMF ¶ 42), Coffey asked to view the property to better understand the situation (SMF ¶ 39), and Tyler agreed to drive him there (SMF ¶ 40).  Coffey suggested that Defendant Douglas Fishel, an Abbottstown-Hamilton Township police officer, accompany them.  (SMF ¶¶ 3, 41.)  The township's chief of police instructed Fishel to ride with the two gentlemen to Lease's apartment building to provide security while Tyler and Coffey spoke to Lease and/or local residents about the complaints.  (SMF ¶¶ 43-44.)

***March 17, 2004, visit to Lease's property***

On March 17, 2004, the three men traveled to Lease's apartment building at 160 Gun Club Road, and pulled into a large parking lot in front of the building used by the tenants and

their guests.  (SMF ¶¶ 46, 50.)  Tyler drove to a location near where Lease was standing outside,

the men spoke briefly, and then Tyler began to drive away from the property.  (SMF ¶¶ 50-51.)

When they were on the main road near the property, Tyler observed electrical wires

sticking up through the apartment building's roof (SMF ¶ 46, 50), and the three men returned to

the apartment to check out the situation (SMF ¶¶ 55-56).  Tyler pulled into the large parking lot

in front of the apartment building for a second time.  (SMF ¶ 56.)  Tyler and Fishel alighted from

the vehicle and walked toward the side common entrance to the apartment building.  (SMF

¶¶ 56-58.)  From his vantage point outside of the apartments, Lease saw Tyler, Fishel, and

Coffey return to the property, and he watched as they walked toward the side entrance of the

building.  (SMF ¶¶ 91-93.)  Lease voiced no objections to their presence at this time.  (SMF ¶

98.)

As Fishel approached the side entrance and alcove to the building, he looked to his right

and observed the meter base for the apartment units.  (SMF ¶ 58.)  Defendants describe the meter

base adjacent the apartment building as being housed in a recessed area that was open to their

view (SMF ¶ 57); Lease, on the other hand, describes the meter base as being inside a fully

enclosed room with a door (CSMF ¶ 57) containing transparent glass panes through which the

inside of the room, including the meter base, is visible (id.); (see Doc. No. 74-3, Zamboni Dep.

75-76, 106-109); (see also Lease Aff. ¶ 5).  Lease further testified in his deposition that the door

to the "meter room" may have been locked, may have been unlocked, or may have even been

open.  (SMF ¶¶ 108-09.)  Lease admits that he did not see either man open the door, and he

acknowledges that he is not claiming that the men broke into the room.  (SMF ¶¶ 106-07.)

Fishel observed that one of the pie plate covers was missing and electrical components

within the meter base were exposed to the air (SMF ¶ 60), and Tyler noticed that some of the seals on the pie plate covers had been broken (SMF ¶ 59).[3] From where he stood viewing the Defendants' actions, Lease observed Fishel and Tyler enter the meter room, and purportedly viewed Fishel remove the cover from a meter base and place it on the floor.  (SMF ¶¶ 94-95.) Lease admits, however, that he has no evidence to contradict Fishel's testimony that before he entered the area where the meter bases were located, Fishel saw what he believed to be a dangerous condition.  (SMF ¶ 102.)

Concerned about the potential safety hazard posed by the improperly sealed meter base and exposed electrical components (SMF ¶¶ 61, 64), Tyler, Fishel, and Coffey left the apartment building and spoke to an electrical lineman Fishel had observed working further along the road and asked him to return to the property with them and make sure the situation was safe (SMF

---

[3]  In his affidavit, Lease claims that the meter base and pie plates were properly affixed and sealed on the morning at issue.  (Lease Aff. ¶ 13.)  The Court notes, however, that Lease was unable to detail their condition during his earlier deposition testimony.  (See Lease Dep. 327) (admitting to having no recollection whether the meter bases were damaged on March 17, 2004). Moreover, the other evidence upon which Lease relies fails to support his claim that the meter bases were in proper condition on the morning of March 17, 2004.  For example, Lease directs the Court to Defendant Coffey's deposition, during which Coffey testified that he did not recall the reason Tyler and Fishel were concerned about the meter bases and was himself unable to appreciate the alleged problem (Doc. No. 74-2, Coffey Dep. 55-56, 104-105); however, considered in context, Coffey's testimony simply demonstrated his lack of familiarity with these types of electrical components (id. at 53-54) (For example, Coffey explained that he "d[id]n't know anything about electrical" and asked, "What's a seal?").  Lease also relies upon the deposition of Barbara Zamboni, a tenant at 160 Gun Club Road, who indicated that at some undefined time in 2003 or 2004 she observed the meter bases while sweeping out the alcove at the side entrance, and that they appeared to be properly covered and sealed.  (Zamboni Dep. 27-29, 45, 68-69, 75-76.)  The testimony of these two individuals does not, as Lease suggests, controvert Fishel's and Tyler's sworn statements that the meter bases were not properly sealed and/or covered on March 17, 2004.

¶¶ 65-66).[4]

At some point Lease approached Tyler and Fishel to inquire about their presence on his property.  (SMF ¶ 100.)  Fishel advised Lease of the perceived problem with the meter base and pie plate covers and explained that the electric company would be arriving to make sure it was safe.  (SMF ¶ 101.)  Lease testified in his deposition that the electric company arrived while Lease and Fishel were conversing.  (SMF ¶ 103.)

### *The electricians arrive*

Craig Mummert, the Adams Electric apprentice lineman approached by Tyler, Fishel, and/or Coffey, agreed to check out the situation, since it was the cooperative's policy to respond to safety concerns such as this, even if the cooperative may not be the electricity provider.[5] (SMF ¶¶ 7, 72-74.)  When Mummert arrived at Lease's apartments and viewed the meter base, he observed that three of the covers were missing.  (SMF ¶¶ 78, 83.)  As per company procedure, Mummert contacted his supervisor, Rich Redding, to inform Redding that Mummert had left his assigned post to inspect a potential safety hazard.  (SMF ¶¶ 83-84.)  Redding instructed Mummert to keep everyone away from the meter bases and await his arrival.  (SMF ¶ 85.)  When Redding arrived at the apartment building, he, too, confirmed that the meter bases were open and

---

[4]  The Court notes that the record is not entirely clear about when, how, and by whom, the electrician was contacted.  Fishel informed Lease that he had called the electric company (SMF ¶ 101), but there is also testimony in the record that the gentlemen drove to where the lineman was working nearby (SMF ¶¶ 68-72).  The chronology of when Lease approached Tyler and Fishel—whether before or after the linesman was contacted—is also somewhat unclear. (See, e.g., SMF ¶¶ 68-71, 101-03; Lease Dep. 358-60).  Any uncertainty about these factual points is insufficient to preclude the entry of summary judgment.

[5]  At the time, it appears that Mummert was unaware Adams Electric supplied electricity to the property at issue.

unsafe, and then called his supervisor, Defendant Ronald Plank, to advise him of the situation. (SMF ¶¶ 86-87.)  Plank arrived shortly thereafter to survey the scene, and he instructed Mummert and Redding to replace the pie plates, seal the meters, and then return to their typical business.  (SMF ¶¶ 88-89.)

While the repairs were ongoing, Lease argued with the Defendants about the reason for their being on his property, asked them to leave, and then left himself.  (SMF ¶¶ 103-104); (Doc. No. 64-2, Lease Dep. 302).  As soon as Mummert's repairs were complete, all of the Defendants exited the premises.  (SMF ¶ 105.)

Tyler did not cite Lease for any code violations that day; in fact, Tyler issued no citations or violations against Lease during his brief service as a Zoning and Code Enforcement Officer. (SMF ¶¶ 30-31.)

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  A factual dispute is material if it might affect the outcome of the suit under the applicable law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Horvath v. Keyston Health Plan East, Inc., 333 F.3d 450, 454 (3d Cir. 2003), and it is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party, Anderson, 477 U.S. at 249.  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  Anderson, 477 U.S. at

8

251-52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  <u>A.W. v. Jersey City Public Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, it essentially becomes "'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  <u>Berckeley Inv. Group, Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006); <u>accord</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  <u>Celotex</u>, 477 U.S. at 322.

With respect to the sufficiency of the evidence that the nonmoving party must provide, a court should grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, or speculative.  <u>Anderson</u>, 477 U.S. at 249-50.  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  <u>Id.</u> at 252; <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

## III.  DISCUSSION

Section 1983 of Title 42 of the United States Code offers private citizens a means to

redress violations of federal law by state actors.  42 U.S.C. § 1983.  The statute provides, in

relevant part, that:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress . . . .

Id.  Section 1983 is not a source of substantive rights; rather, it is a method to vindicate

violations of federal law committed by state actors.  See, e.g., Neumeyer v. Beard, 421 F.3d 210,

213 (3d Cir. 2005); Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000).  To establish a claim

under this section, a plaintiff must show a deprivation of a "right secured by the Constitution and

the laws of the United States . . . by a person acting under color of state law."  42 U.S.C. § 1983.

The satisfaction of these elements does not, in all circumstances, guarantee recovery.

The doctrine of qualified immunity provides that state actors who perform discretionary

functions are "shielded from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person should have

known."  Hill v. Borough of Kutztown, 455 F.3d 225, 244 (3d Cir. 2006) (quoting Wilson v.

Layne, 526 U.S. 603, 609 (1999)).  To gain the protection of this doctrine, the defendant must

show that (1) the plaintiff has not demonstrated "a deprivation of an actual constitutional right"

or (2) that the right at issue was not "clearly established at the time of the alleged violation."

Conn v. Gabbert, 526 U.S. 286, 290 (1999).  "When immunity is raised at the summary

judgment stage, the court's analysis of the merits of the claim for purposes of summary judgment

essentially merges with its analysis of the existence of a deprivation of federal rights for the

purposes of immunity." <u>Barshinger v. Buffington</u>,  No. 1:03-CV-0506, 2004 U.S. Dist. LEXIS

28929, at *17-18 (M.D. Pa. June 10, 2004) (citing cases).

With this framework in mind, the Court will turn to the claims asserted by Lease to

determine, first, whether he has offered sufficient evidence of a deprivation of a constitutional

right by a state actor, and second, whether the right at issue was clearly established at the time of

the alleged violation.

**A.**     **Defendants Tyler and Fishel**

*1.     Search*

Lease asserts that Tyler and Fishel violated his Fourth Amendment rights by improperly

entering upon his property, searching his "meter room," and allegedly damaging a certain meter

base located therein.  (Doc. No. 6, ¶¶ 1, 14.)  Defendants Tyler and Fishel contend that this claim

is baseless on the grounds that they "lawfully observed a potentially dangerous condition

alongside Plaintiff's apartment building, which was open to the public and where Plaintiff lacked

an expectation of privacy.  Plaintiff does not dispute that the meters could be seen in plain view

from outside of the building."  (Doc. No. 66, at 5); (<u>see also</u> Doc. No. 76, at 4) ("Plaintiff failed

to establish that a 'search' occurred; to the contrary, the evidence of record establishes that

Defendants observed a dangerous condition while standing in a common area.").

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.  This amendment limits government action in two ways: "First, it

requires that searches and seizures be reasonable, and second, it states that when a warrant is required . . . it must have certain characteristics."  United States v. Hartwell, 436 F.3d 174, 177 (3d Cir. 2006).

The threshold inquiry for a Fourth Amendment claim such as Lease's is whether the government's conduct amounted to a "search."  Hartwell, 436 F.3d at 177.  "A Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."  Kyllo v. United States, 533 U.S. 27, 33 (2001) (citing Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)); see also Hartwell, 436 F.3d at 177, 178 n.4.  Having reviewed the facts of this case, the Court concludes that Lease has failed to establish that Defendants Tyler and Fishel engaged in a search as contemplated by the Fourth Amendment.

While it is true that "[a]n individual's Fourth Amendment interest in the curtilage of his home has been well settled for over a century," Estate of Smith v. Marasco, 318 F.3d 497, 521 n.13 (3d Cir. 2003), "[t]he concept of curtilage has been significantly modified when applied to a multiple dwelling," United States v. Romano, 388 F. Supp. 101, 104 (E.D. Pa. 1975); see also LaFave, 1 Search & Seizure § 2.3(f) (4th ed.) ("[I]t is a fair generalization that the lands adjoining a multiple-occupancy residence are less likely to receive Fourth Amendment protection than the yard of a single family residence.").  Because of the number of residents and guests visiting a multiple-occupancy residence, some courts have reasoned that there is "no justified expectation of privacy as to a portion of the home which all residents and visitors must use to enter, the common yard open to the public, or the parking lot open to all users of the apartment building."  LaFave, 1 Search & Seizure § 2.3(f) (citations and internal quotation

marks omitted).

In the instant case, when Tyler and Fishel observed unusual wires sticking up from the

six-unit apartment building owned by Lease, they pulled their car into the parking lot used by

tenants and their guests, exited the vehicle, and began walking toward a side common entrance

of the apartment building (SMF ¶¶ 54-56; CSMF ¶¶ 54-56), ostensibly to inquire about the

unusual wires or obtain a better view of the situation and ascertain whether it conformed with all

building codes.  When they were standing outside of the apartment building in a common area

utilized by those entering and exiting the building, they observed in plain view a meter base with

electrical components that were exposed and/or improperly sealed.  (SMF ¶¶ 57-60.)[6]  Their

observation of this hazard from a common area does not amount to the intrusive search Lease

believes it to be.  See Marasco, 318 F.3d at 519 ("[W]hen the police come onto private property

to conduct an investigation or for some legitimate purpose and restrict their movements to places

where visitors would be expected to go (e.g. walkways, driveways, porches), observations made

from such vantage points are not covered by the Fourth Amendment.") (quoting LaFave 1 Search

& Seizure § 2.3(3)); see also New Jersey v. Domicz, 907 A.2d 395, 405 (N.J. 2006) ("An area

within the curtilage to which the public is welcome, such as a walkway leading to an entrance to

a home, is not afforded Fourth Amendment protection because the resident has given implicit

---

[6] While the parties disagree whether there was, in fact, a "meter room," Lease testified during his deposition that the door to that area might have been open (SMF ¶¶ 108-109), allowing Defendants to view the room's contents from their vantage point.  To the extent that such a door might have been closed, Mrs. Zamboni's deposition testimony demonstrates that the meter bases were would still be visible through the glass panels of the door.  (Zamboni Dep. 75-76) ("Answer: The door has glass in it.  You can see right in the room.  Question: There's glass in the door?  Answer: That you could see into the room—yeah.  At the time."); (see also Lease Aff. ¶ 5) ("On March 17, 2004, there was a door with glass panels on it that could be seen through.").

consent to visitors that approach the home that way.  In other words, when a law enforcement officer walks to a front door or the back door for the purpose of making contact with a resident and reasonably believes that the door is used by visitors, he is not unconstitutionally trespassing on the property.") (citations omitted).

Insofar as Lease relies upon their actual entry into the "meter room" to form the basis of his claim (assuming that there was, in fact, such a room), Tyler and Fishel's actions were reasonable and, hence, constitutional under the circumstances.  The touchstone of Fourth Amendment analysis is reasonableness.  United States v. Pollard, 326 F.3d 397, 410 (3d Cir. 2003) (citing Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 450 (1990)).  What is "reasonable" depends upon all of the circumstances surrounding the search and the nature of the search itself, United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985) (citations omitted); it is an inquiry that calls for the consideration of, "on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests," United States v. Williams, 417 U.S. 373, 376 (3d Cir. 2005) (quoting United States v. Knights, 534 U.S. 112, 118-19 (2001)).  This balancing generally requires that a warrant be obtained upon a showing of probable cause, Pollard, 326 F.3d at 411, see also U.S. Const. Amend. IV; however, various exceptions to this general rule exist, such as when the circumstances demand immediate action, Camara v. Mun. Court of City and County of San Francisco, 387 U.S. 523, 540-41 (1967).

Here, Lease admits that he has no evidence to contradict Fishel's testimony that before Fishel entered the area where the meter base was located, he saw what he believed to be a dangerous condition.  The record reflects that any intrusion into the "meter room" was limited to

14

a closer inspection of the meter base that Tyler and Fishel believed to pose a danger to the physical safety of inquisitive individuals who might touch the electrical components and to nearby property should something come into contact with the meter base and start a fire. Further, any such entry occurred before Lease approached them and asked them to leave. See Camara, 387 U.S. at 539-40 (noting that "it seems likely that warrants should normally be sought only after entry is refused unless there has been a citizen complaint or there is other satisfactory reason for securing immediate entry").[7] There is nothing in the record to suggest that Tyler and Fishel acted unreasonably to the perceived dangers of the meter base or with "pretext" in assuming that electrical current flowed through the meter base, see New York v. Burger, 482 U.S. 691, 716 n.27 (explaining in the context of administrative searches that evidence of pretext may establish unreasonableness).  Rather, Defendants Tyler and Fishel acted within the Fourth Amendment's boundaries of "reasonableness" by responding in an appropriate manner to what they perceived to be a very real danger to the public.  Thus, no violation of Plaintiff's constitutional rights occurred, Defendants Tyler and Fishel are entitled to qualified immunity, and Lease's unlawful search claim cannot proceed.

    **2.      *Retaliation***

    Lease also asserts that Tyler and Fishel retaliated against him in violation of his First Amendment rights.  To establish a claim under § 1983 predicated on the First Amendment, a plaintiff must show "(1) that [he] engaged in a protected activity, (2) that defendants' retaliatory

---

[7]  See also Barshinger, 2004 U.S. Dist. LEXIS 28929, at * 21 (referring to Camara, and stating in the context of a qualified immunity analysis: "Officials could reasonably interpret this statement to permit them to search and seize private property when they had received a citizen complaint about the property, had attempted to notify the owner about the problems, and believed that further delay would create a public safety hazard.").

action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. ex rel. Jean W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007).  To establish a causal connection, a plaintiff usually must prove either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."  Id.  In the absence of the above, a plaintiff must show, "from the evidence gleaned from the record as a whole," that the trier of fact should infer causation.  Id. (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).  The Third Circuit has urged district courts to "be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate."  Id.

Here, Lease maintains that the events of March 17, 2004, were retaliation for his protected activity of petitioning the government for redress of grievances.  With respect to establishing the requisite causal connection between his protected court filings and the allegedly retaliatory actions, Lease has not argued that temporal proximity between the two would, in and of itself, establish the requisite causal link.  Nor has Lease developed evidence of a pattern of antagonism coupled with questionable timing; rather, Lease seems to believe that the record as a whole is sufficient to establish a causal connection between the protected activity and the alleged retaliatory conduct.

According to Lease, Hamilton Township's alleged desire to retaliate against him stems from a long-standing dispute between the two that includes, inter alia, lawsuits filed by Lease in

1996, 1999, and 2000 (Doc. No. 6, ¶ 16; SMF ¶¶ 110-12; CSMF ¶¶ 110-12), at least one of

which was pending on appeal in March 2004 (Doc. No.73-1, at 14).  In support of his argument

that Defendants Tyler and Fishel engaged in retaliation because of these lawsuits, Lease relies

upon the following: (1) Tyler and Fishel's positions as township employees; (2) their presence at

a public meeting where Lease's property was discussed; (3) their failure to obtain a warrant

before arriving at the apartment building; (4) Fishel's presence at the property to provide

security and (5) the fact that at least one appeal was pending on March 17, 2004, the date of the

events in question.  (See Doc. No 73-1, at 13-14.)  Lease also speculates that Fishel hoped to get

a promotion by retaliating against him.  (CSMF ¶ 116.)

      Contrary to Lease's opinion, he has presented insufficient evidence of a retaliatory

motive to support a finding of causation.  His arguments lack support in the record and are

otherwise conclusory and speculative.  Indeed, based upon Lease's causation evidence, it would

seem that any township employee remotely aware of Lease's lawsuits who took action Lease

perceived as objectionable would potentially be liable for retaliation.  Lease had ample

opportunity during the course of discovery to develop the bases for his First Amendment claim

against Defendants Tyler and Fishel, but Lease has failed to adduce anything beyond the fact that

he was engaged in litigation against the township that employed Tyler and Lease when they

appeared on his property on March 17, 2004, and engaged in conduct Lease found objectionable,

but which this Court has determined was reasonable under the circumstances.  This and Lease's

own speculation about the motives of these men form the basis of his First Amendment claim.

The Court has reviewed the record, and this is simply not a case where the record considered as a

whole would support a finding of causation.  Accordingly, Defendants Tyler and Fishel are

entitled to summary judgment on Lease's First Amendment retaliation claim.

**B.      Defendants Plank and Adams Electric**

Lease's claims against Defendants Plank and Adams Electric likewise fail for a number of reasons.  The most obvious defect with Lease's § 1983 claims against them is that neither Plank nor Adams Electric are state actors, nor were they "willful participant[s] in joint activity with the State or its agents." Adickes v. S.H. Kress & Company, 398 U.S. 144, 152 (1970). Although Lease claims that a civil conspiracy amongst the Defendants was afoot, the only evidence that he has introduced in support of this contention as to the non-governmental defendants is the fact that Plank arrived at Lease's property after Richard Redding informed him—pursuant to Adams Electric's policy—that Redding and Mummert had left their regular duties to respond to concerns of a potential electrical hazard at Lease's apartment building. Lease simply speculates that Defendants Tyler, Fishel, and Plank reached some kind of tacit understanding upon Plank's arrival that they would deprive Lease of federally guaranteed rights; he points to nothing in the record that supports such an assertion.

Even if Plank and Adams Electric were state actors, their conduct did not violate any of Lease's constitutionally protected rights.  With respect to Lease's claim that Plank and Adams Electric violated his Fourth Amendment rights by engaging in an improper search of his premises, it bears noting that Lease explicitly provided Adams Electric an "easement for the inspection, construction, operation, repair, maintenance, relocation and removal of electric distribution lines, meters, or other facilities to serve [Lease's] premises."  (SMF ¶¶ 17-19.) Thus, Lease had consented to the presence of Adams Electric and its employees on his property for the very purpose for which they were there—for the repair and maintenance of the

improperly sealed meter base.  That Lease believes Mummert should have been able to complete

the repair himself is of no relevance.  The record reflects that Mummert was a lesser experienced

apprentice lineman who, in accordance with company policy, contacted his supervisor, Redding,

who in turn contacted his supervisor, Defendant Plank.  The Adams Electric employees arrived

at the apartment building, confirmed that the meter base posed a hazardous condition, performed

(or supervised) the repairs that were required to abate that danger, and then promptly left the

premises.  Rather than engaging in an unconstitutional search, Plank and Adams Electric simply

repaired a safety hazard brought to their attention by concerned township officials and promptly

returned to their business.

With respect to his First Amendment claim against Plank and Adams Electric, Lease

offers little more than his speculation that Plank and Adams Electric were retaliating against

him.[8]  Indeed, Lease has not even pointed to evidence of record that Plank and Adams Electric

were aware of Lease's protected activity, the filing of the lawsuits against the township.  (SMF

¶ 126); (see also CSMF ¶ 126) (the evidence cited by Lease does not controvert Defendants'

factual statement).  As with Defendants Tyler and Fishel, Lease simply cannot establish a causal

connection between Lease's protected activity and the purported retaliation of Plank and Adams

Electric.

Accordingly, Plank and Adams Electric are entitled to summary judgment on all claims

brought against them because they are not state actors, and even if they were, Lease has not

presented sufficient evidence which, if believed by the trier of fact, would establish that they

---

[8]  For example, Lease opines that Plank approached Fishel in an effort to have Lease
criminally charged with theft of electricity.  (CSMF ¶¶ 117-118.)

violated his constitutional rights.

**IV.     CONCLUSION**

Lease has presented insufficient evidence to support his claims under 42 U.S.C. § 1983.

Thus, summary judgment will be granted in favor of Defendants with respect to all of Lease's

claims.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID R. LEASE,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 1:05-CV-618** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **KEVIN TYLER, <u>et</u> <u>al.</u>,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

**AND NOW**, this 30th  day of June, 2008, upon consideration of Defendants' motions for summary judgment (Doc. Nos. 60, 61, 65), and for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED** that the motions for summary judgment are **GRANTED**.  The Clerk of Court is directed to enter judgment in favor of Defendants and to close this case file.


 S/ Yvette Kane_____
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania